McBRIDE, Judge.
Defendant is the appellant herein. The case arises from a suit brought by a partnership engaged in the wholesale candy business against the defendant insurer under a blanket position bond which insures plaintiff against any loss of money or other property, real or personal, through any fraudulent or dishonest act or acts committed by any one or more of plaintiff’s employees, to recover for the loss of certain merchandise which is claimed to have been unlawfully taken from plaintiff’s premises at 419 Decatur Street, New Orleans, by certain of plaintiff’s employees during the fiscal years ending June 30, 1957 and June 30, 1958. The suit is for $17,472.48, with legal interest from September 11, 1958, until paid. Plaintiff also claims a penalty of 12% damages on the principal and interest due and a reasonable attorney’s fee under LSA-R.S. 22:658, the petition alleging that defendant’s failure and refusal to pay the claim was arbitrary, capricious and without probable cause.
Defendant’s answer sets up that under the terms of the blanket position bond plaintiff is obligated to conclusively prove that its inventory shortage had been caused by the fraud and dishonesty of plaintiff’s employees, but despite the said express provisions, plaintiff has not supplied defendant with any proof other than a letter bearing date of October 24, 1958, addressed ■••o defendant by a representative of plaintiff which contains a tabulation of an alleged inventory shortage annexed thereto. Defendant denies that in refusing to pay the claim it acted in an arbitrary or capricious manner or without probable cause.
The case proceeded to trial and there was judgment in favor of plaintiff for $17,123.-03, plus interest as prayed for. Said sum is the amount sued for minus 2% thereof. The penalties under the above-mentioned section of the Revised Statutes were denied.
The questions presented by this appeal are (1) whether the gross profits method utilized by plaintiff in establishing the loss is reasonable, and, (2) whether the loss was sustained by plaintiff over a two-year period. In the event plaintiff is to prevail, a third question arises and that is whether defendant had reasonable justification for rejecting the claim.
On September 11, 1958, a member of the Police Department of New Orleans discovered that one of plaintiff’s employees had in the trunk of his automobile a box of a well-known brand of chewing gum which had been stolen from plaintiff. The owner of the vehicle was arrested and during the ensuing investigation other employees were implicated. In all, five men were arrested, one of whom was the warehouseman, the others being operators of plaintiff’s delivery trucks. One of those arrested was not working for plaintiff at the time of the discovery of the theft. The culprits admitted their guilt and it is well established they had systematically stolen from plaintiff’s warehouse various goods, wares and merchandise kept by plaintiff in its salable stock. The pilferage had been going on for a considerable period of time.
Mr. Reiss, one of the component partners of plaintiff, explained that the gross profit margin of the business has always been small and that it requires a large volume to operate at a net profit. The business is conducted according to standard practices prevailing amongst wholesale candy concerns, and the system employed by plaintiff is designed to insure the honesty of the company’s employees, and had produced *679 what appeared to be a satisfactory result since there had been only one small loss of about $18 arising from theft over a fifteen-year period. The plaintiff took a physical inventory of stock annually and the count was supervised not only by one of the partners but also by a representative of plaintiff’s independent certified public accountant.
The business is operated on a fiscal year basis, the end of the period being June 30 of each year. At the end of the 1957 period Mr. Reiss noted a shrinkage in the percentage of gross profits from 16.64%, which prevailed at the end of the 1956 period, to 16.04% for 1957. The 1958 fiscal year produced a lesser gross profit, to-wit: 15.31%. These at first blush might appear to be but negligible decreases, but when it is considered that the sales volume for 1957 amounted to $1,430,000, the difference amounted in gross profit to approximately $8,600. Mr. Reiss could not understand the reason for the shrinkage, and after 1958 figures became available and the shrinkage continued, he was still unable to reconcile the discrepancy. The 1958 returns showed that there had been a drop in gross profits of $21,300, making a total disparity for the two years, as compared with 1956, of $29,900. However, during the fiscal year 1958 plaintiff acquired a new customer to whom it sold approximately $96,000 of merchandise and on these sales plaintiff made only a gross profit of 8% or $7,680. During the same period there was a lessening of gross profits occasioned by $11,000 of new export sales being made at 5'% gross profit instead of 16.64%, this amounting to $1,280. Excluding the difference in gross profits between the percentage actually made on the above two items and the normal percentage prevailing, which aggregates $9,575, from the computed loss of gross profits of $29,-900, the net loss of gross profits unaccounted for would be $20,325.
It is contended by the defendant that the utilization of the gross profits percentage system of proving the loss is unreasonable and unrealistic. Of course, it should be well known to everyone that the ideal method of ascertaining plaintiff’s loss would be to work from the annual physical inventories of the salable stock by checking there against all purchases made during the year involved and deducting therefrom all sales made. After reading the record herein, we are convinced such method of arriving at the amount of the systematic pilferage of the merchandise over an extended period would defeat its own purpose for the reason plaintiff deals in between 1200 and 1500 different items and the cost of taking such a net inventory as alluded to above would be prohibitive. Mr. Bernard H. Levy, a certified public accountant, who appeared at the trial on behalf of defendant, admitted that to require a faithful inventory over a two-year period involving at least 1200 items would be exorbitant, and his opinion was that the cost could be as much as the amount of the claim, and that as an accountant he could not recommend that a client go to such expense. This expert witness of defendant further admitted that if the client did not keep a perpetual inventory, he himself, in order to figure the loss, would have used the gross profits method which is one of the accepted and available methods of proving the type of loss involved in this case. Plaintiff does not maintain a perpetual inventory. Mr. Levy further said that if all factors are the same, the shrinkage in gross profits will equal the value of the shortage and that one can get the right answer as a matter of mathematical fact. It is shown that all factors in connection with plaintiff’s business for the fiscal years 1957 and 1958 are commensurate with the factors in the year 1956 which was used as the criterion. Mr. Reiss testified that he could find no variance that would explain the losses for the years in question, but he knew something was wrong because profits and the method of doing business had been “pretty constant” for some years.
Counsel for defendant contend that the fiscal year ending June 30, 1956, should *680 not have been taken as the criterion for establishing the loss, but rather the norm should have been determined by an averaging of the gross profits for several previous years. It is argued that insofar as plaintiff’s business was concerned 19S6 was an exceptional year with large profits. Briefly stated, defendant’s position is that the 1956 gross profits percentage alone should not have been used as a constant in computing the loss for the two subsequent years. In attempting to fortify their position counsel point out that for the year 1956 plaintiff reported a net income of $80,142.53, while for the fiscal year ending in 1957, the net income reported was $53,664.77 and for the fiscal year ending 1958 the net profit was $55,613.07. Plaintiff’s accountant showed that the volume of sales in each of the years 1957 and 1958 was much greater than those for 1956 and by all accounts the net income for the fiscal years ending in 1957 and 1958 should have been larger than the net income for 1956. The fact that the net income for the two subsequent years was less than for the fiscal year ending in 1956 appears to us to be additional evidence of a shrinkage in gross profits for the subsequent years which could only have been caused by the unlawful acts of plaintiff’s employees.
All of the calculations presented by plaintiff at the trial, as well as those shown on the proof of loss which plaintiff submitted to defendant, had been made by Mr. Albert Richard, Certified Public Accountant, who is the resident partner of W. F. LaFrantz & Co., a national firm of independent certified public accountants. He is President of the New Orleans Chapter of the Society of Louisiana Certified Public Accountants.
However, in fairness to defendant, Mr. Richard did not rely solely on the loss of gross profits method which showed the amount of the disparity to be $20,325. As an additional method of establishing the claim, he took into consideration the admissions of the miscreant employees and made an analysis and projection thereof which indicated that the goods stolen during the two-year period was $17,472.48, which figure, while lower, showed the thefts aggregated a substantial amount.
The defendant contends there is no proof showing that plaintiff’s loss occurred over a two-year period. Counsel point to the police report which states that the systematic stealing by the employees extended well beyond one year. The argument is made that it would require a stretch of the imagination to conclude that the loss occurred with any degree of regularity even over a one-year period.
Turning to the written confessions of the employees, we find that Joseph Pierre, the warehouseman, admitted that he began stealing “about one year ago,” and Leonard Wilson, in admitting his participation, declared his activities started “about a year and a half ago.” The other three men did not state for how long a period they had been taking plaintiff’s merchandise. Mills, one of those apprehended, as has been stated, left plaintiff’s employ'before the theft was discovered, his employment record showing he worked for plaintiff from May 1955 to October 1957. At the police station Mr. Reiss made the statement he had been missing merchandise for “about one year,” but we think this statement must have been made on the basis of what he heard from the thieves. But, be that as it may, the statement Mr. Reiss made that merchandise had been missing for “about one year” would not preclude recovery of losses appearing over a longer period as we believe it did.
It is a well-known fact that a thief will endeavor to underestimate the extent of his depredations, and we think that those involved in the theft ring would prove no exception. The fact that the diminution of gross profits showed a substantial shrinkage for the two years which cannot be explained otherwise, there being no material variation in business methods, leads to the inevitable conclusion that the stealing had been going on for that period. But, even assuming that merchandise was systematically stolen for only a year and a half *681 as stated by Pierre, rather than two years, the loss in gross profits appearing in the audit of the 1957 year, would necessarily reflect only what theft losses actually took place even though the audit covered a whole year. It might be stated the loss for the year 1957 is much less than that appearing for 1958.
The statements of the warehouseman, Joseph Pierre, who undoubtedly was the ringleader, admitted the theft of 3 or 4 cases of chewing gum per week. In his written statement he remembered stealing 17 cases of merchandise of which seven (or 41%) represented chewing gum. The other ten cases (or 59%) of the total of 17 were composed of other merchandise*
Joseph Pierre explained the disposition of the 17 cases of merchandise as follows:

If there was regularity in the taking of the merchandise at the same ratio, and we believe there was, then projecting such loss over the two-year period would give the following figures (the tabulation being made by Mr. Richard), to-wit:

*682 Plaintiff in asserting its claim against defendant, both in the proof of loss and judicially, used the lesser of the two figures, or $17,472.48, rather than the amount arrived at under the gross profits method. This, of course, is the more favorable to defendant.
It is true the blanket position bond upon which the suit is based makes the insurer liable for any loss of money or other property, real or personal “which the Insured shall conclusively prove.” Defendant argues plaintiff’s method of computing its claim, said to be unreasonable and unrealistic, does not conform to the conditions of the bond which require conclusive proof. The particular provision of the policy relied on should not be rigorously construed. The general rule has been stated to be that “conclusive” evidence in burglary and theft policies should be interpreted so as not to give the term its strict technical meaning, but rather it should be given a reasonable construction, i. e., evidence reasonably establishing a loss. Alexandre of London, Washington, D. C., Corporation v. Indemnity Insurance Company of North America, D.C., 182 F.Supp. 748; Morrow Retail Stores, Inc. v. Hartford Accident & Indemnity Co., D.C., 111 F.Supp. 772; Couch’s Cyclopedia of Insurance Law, Vol. 8, § 2241; 169 A.L.R. 228 et seq.; Leader Clothing Co. v. Fidelity & Casualty Co. of N. Y., 10 Cir., 237 F.2d 7.
 We think that plaintiff has reasonably proved the amount of its loss and the method of arriving thereat has our complete approval. In the light of the circumstances of the case we can think of no better method.
Plaintiff-appellee has made answer to the appeal contending that the trial judge erred in deducting 2% of the claim and praying for an increase in the judgment to the original amount plaintiff demanded. Plaintiff also complains that the trial judge erred in not awarding the penalties provided for by LSA-R.S. 22:658 and prays that the judgment be amended so as to make provision for an allowance of such penalties to plaintiff.
The 2% was deducted by the trial judge because the evidence showed plaintiff paid all bills for merchandise within 10 days and for that reason was the beneficiary of a discount at that rate allowed by the vendor. The deduction was correct. While the record does not inform us whether the ledger accounts showing merchandise purchased set forth the actual invoice price or the purchase price less discount, we are inclined to the belief said accounts merely reflect the merchandise at the full invoice rate and that the 2% discount is carried in a separate account and only manifests itself upon the striking of the profit and loss statements. There are indications that the tabulation made by Mr. Richard of the merchandise stolen reflects the full invoice price thereof although plaintiff took advantage of the 2% discount. To restore the deduction, as plaintiff would have us do, would be to allow a recovery for 2% more than the actual cost of the merchandise.
The imposition of statutory penalties is not warranted. There is no evidence at all tending to show the defendant acted arbitrarily, capriciously or without proper cause in rejecting plaintiff’s claim. The method of proving the loss in this case, while satisfactory, is most unique, and whether it was the proper method is certainly a question which could be a subject of honest debate. Then, too, we must take into consideration the fact that part of plaintiff’s demands, i. e., the 2%, is disallowed. Plaintiff was not entitled to all it demanded and there was justification for the rejection of the claim.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.