153 So.2d 475 (1963)
STANDARD BRASS & MANUFACTURING CO.
v.
MARYLAND CASUALTY CO.
No. 1034.
Court of Appeal of Louisiana, Fourth Circuit.
May 6, 1963.
Rehearing Denied June 4, 1963.
*476 Deutsch, Kerrigan & Stiles, Ralph L. Kaskell, Jr., and John F. Tooley, Jr., New Orleans, for defendant and appellant.
Gertler, Gallinghouse, Stahl, Hart, Sear & Duran, Melvin J. Duran, New Orleans, for plaintiff and appellee.
*477 Before McBRIDE, REGAN and SAMUEL, JJ.
McBRIDE, Judge.
Defendant appeals from a judgment in plaintiff's favor for $10,247 (15 cents less than prayed for). Plaintiff, a dealer in metals such as copper, bronze and brass, has a branch establishment in New Orleans. Two blanket comprehensive dishonesty, disappearance and destruction policies (the earliest being for the maximum amount of $15,000, bearing the date December 30, 1953, and the other, being a renewal thereof, for the maximum sum of $50,000, became effective December 30, 1956) issued by defendant, insure plaintiff, among other things, against loss for that part of any inventory shortage which the assured shall conclusively prove to have been caused by the fraud or dishonesty of any of its employees. The pertinent allegations of the original and amended and supplemental petitions are that about June 13, 1957 one of plaintiff's employees was detected stealing metal and he implicated two others, and it developed that the three would steal merchandise and sell the same to scrap metal dealers; that as a result of a physical inventory it was discovered that the following was missing and unaccounted for by sales or otherwise:

"Continuous cast bronze bushing
stock, 13,362 lbs. @ 65 cents
per lb. $8,685.30
"Round solid brass and bronze
rods, 1,480 lbs. @ 50 cents
per lb. 740.00
"Soft copper in rolls, 181 lbs.
@ 65 cents per lb. 117.65
"Soft copper tubing in coils,
614 lbs. @ .707 per lb. 434.11
"Bar solder, 450 lbs. @ 60
cents per lb. 270.00
 ___________
 $10,247.15";

that within a few days after June 14, 1957, defendant, which is liable therefor, was informed of the loss and demand was made for payment under the policies; that the claim has been denied. Plaintiff sought judgment for the above amount and also claimed a penalty of 12 per cent damages on the principal and interest, plus a reasonable attorney's fee under LSA-R.S. 22:658, it being averred that defendant's failure and refusal to pay was arbitrary, capricious and without probable cause. The trial court denied the penalties, but by answer to the appeal plaintiff prays for same and seeks an amendment of the judgment accordingly.
Defendant answered disavowing liability and denying the loss. Further, in the alternative, defendant pleaded that plaintiff had failed to give written notice "of any loss or occurrence which may give rise to a claim as soon as practicable and not later than fifteen days after" plaintiff's discovery thereof as required by Section 6 of the policy. Defendant also pleaded that plaintiff did not file within four months after the discovery of a probable claim a sworn affirmative, itemized proof of loss as required by policy stipulations; that plaintiff did not immediately notify police authorities as required and did not sue for recovery within the time provided in the policy, all of which breaches of the conditions prejudiced defendant's rights.
In brief counsel for defendant set forth the following specification of errors committed by the trial court:
"1. In granting judgment to plaintiff in the absence of proof reasonably establishing an inventory loss * * *.
"2. In excluding evidence showing inventory shortages arising from reasons other than employee dishonesty.
"3. In failing to hold that plaintiff's breach of policy provisions barred recovery.
"4. In refusing to reopen the trial for additional proof."
A foreman in plaintiff's warehouse on the afternoon of June 13, 1957, observed a negro employee named Matthews carry a piece of stock bronze, weighing 85 lbs. and *478 valued at $45, out of the building and conceal it in a pile of rubbish near the sidewalk. The foreman summoned the police who apprehended Matthews that evening when he endeavored to retrieve the metal from its hiding place in the rubbish. Matthews admitted to the police that he had stolen the bronze with the intention of selling it to a scrap metal dealer. Matthews claimed he had stolen only "that single piece of bronze."
Plaintiff's metals manager visited the yard of the scrap metal dealer mentioned by Matthews and located one item he identified as at one time belonging to plaintiff, a roll of copper, which Matthews had sold for $86.
A weigher in the employ of the scrap metal dealer stated that the police took possession of the roll of metal. He also testified that there were some other items of plaintiff's materials in the yard although the record is not clear as to what these other items consisted of. The weigher did state, however, that he had seen Matthews "at least a dozen times" and had bought scrap material from him on several occasions. Via telephone Matthews admitted to Cartullo, plaintiff's district manager, that he had stolen "a lot of merchandise" over a period of from 6 to 8 months preceding June 1957.
On the second day of the trial (a year and a half later), Cartullo, the district manager, stated that it was in July 1956 he first began to notice shortages in the inventory and sensed there had been theft; that there had been no shortages shown by prior inventories. He pointed out that no one had broken into plaintiff's warehouse and he reasoned that any thefts must necessarily have been inside jobs.
Brown and Jeanlouis, both negroes, fellow employees of Matthews, also became implicated and they, with Matthews, were arrested and formally charged in the criminal district court with theft. There is no evidence in the record showing that Brown or Jeanlouis ever removed metal from plaintiff's warehouse, but we have no inkling of doubt that the three men were guilty of systematic theft over a period of about 8 months starting sometime in the latter part of 1956 up to and including a part of June 1957.
No doubt the three thieves worked in concert. Brown had importuned Mr. Cartullo to hire one of Brown's friends to cart away accumulated trash. The day after his arrest Matthews telephoned Jeanlouis at plaintiff's warehouse. Their conversation was overheard by the switchboard operator, and later when Jeanlouis and Brown began to load the trash for removal to the dump by Brown's friend, rolls of copper, bronze bushings and brass rods were found concealed in the trash pile.
The first notice of a "possible" claim by plaintiff was made by Cartullo by telephone to the insurer on June 15, 1957. No formal proof of loss was filed but claim was made in the form of unsworn letters and documents which consisted of a copy of a list showing the alleged losses (plaintiff's Exhibit 3) and several letters written in June 1957 to various parties, one being to the insurer's agent in Beaumont, Texas. Certain inventory cards were exhibited to defendant's representatives about June 28 or 29, 1957.
The alternative defense, which we will discuss first, is that plaintiff violated policy conditions by not giving notice to the insurer and furnishing proof of loss in conformity therewith.
Section 6 of the policy conditions and limitations reads in part thus:
"Section 6. As soon as practicable but in any event not later than fifteen days after discovery by the Assured of any loss or of any occurrence which may give rise to a claim, the Assured shall give the Company written notice thereof and within four months after such discovery shall file with the Company affirmative itemized proof of loss, duly sworn to. * * *"
*479 It is much too late for the insurer to rely on the defense that proper notice of any loss or occurrence which might give rise to a claim or that the prescribed proof of loss were not submitted in accordance with the above-quoted conditions because the insurer has most irrevocably and effectively waived any such defense. We have heretofore mentioned that a list showing the inventory shortages (plaintiff's Exhibit 3) was furnished defendant in June 1957. Such list contains 5 columns for (1) the description of the merchandise shown on the 92 inventory cards hereinafter mentioned, (2) the shortage of each item in inches as of January 31, 1957, (3) the weight of the shortage as of that date, (4) the shortage of each item in inches as of June 14, 1957, and (5) the weight of the shortage as of that date. Upon defendant's receipt of said list, it made no complaint to plaintiff that the latter had failed to give notice in accordance with the policy or that the proof of loss did not meet policy conditions. Defendant knew in June 1957 plaintiff had made claim for a loss which occurred as far back as 1956 as shown by the January 1957 inventory, and it was cognizant, too, that plaintiff had not given notice "as soon as practicable but in any event not later than fifteen days after discovery by the Assured of any loss or any occurrence which may give rise to a claim" and it also knew that the proof of loss was not of the type the policy contemplated.
Yet, notwithstanding such knowledge in defendant that plaintiff had not conformed to the provisions of Section 6, we find that on December 4, 1957, defendant sent a letter to its assured returning copies of statements and correspondence in connection with the claim. The letter closed thus:
"We appreciate very much your splendid assistance in this matter."
Plaintiff also received a letter from the insurer dated February 28, 1958, reading in part:
"The fact that you may have an inventory shortage of $10,247.06 may be correct, but we believe you will agree that this information mentioned above only very partially indicates that such loss was due to dishonesty of your employees.
"Accordingly, it is our position that you so far have failed to meet the burden of proof required by the bond, with reference to inventory claims of this nature. We, therefore, on the basis of the information you have submitted so far, can not honor your claim. We will, of course, be glad to consider any further evidence you may have to submit in proof of same and will await your further advices."
The letters from the insurer attest that notwithstanding the alleged violation of policy requirements, the insurer processed, determined and declined the assured's claim, and by so doing lulled the assured into a false sense of security. It would indeed be against good conscience to permit the insurer for the first time in answer to raise the objection that notice and proofs were not given or were insufficient or that the police were not timely summoned, etc.
"The condition in a fidelity bond or policy calling for notice or proof of loss within a specified time may be waived by the surety, and such waiver may be implied from the surety's conduct or actions." 23 A.L.R.2d p. 1096.
"Waiver of the requirement of a written notice of loss was held to have resulted in United States Fidelity & Guaranty Co. v. Paxton (1908) 32 Ky. L.R. 707, 106 S.W. 841, from the action of the surety, upon oral notice to its agent, in sending a representative to investigate assured's accounts, it appearing that such representative and the assured finally `struck a balance showing the indebtedness.' In so deciding the court said that when the surety had such notice from the assured as gave it all the necessary information regarding *480 the loss, and upon which it acted without complaint, lulling the assured into a feeling of security on that score, it would not be heard to say at the trial that it did not have the notice called for by the policy, for by its conduct it had waived such notice. * * *" 23 A.L.R.2d p. 1097.
"And respecting a complaint on a bond requiring notice of any dishonest act `at the earliest practicable moment, and at all events not later than five days' after discovery, where the plaintiff alleged that it gave notice `at the earliest practicable moment,' that defendant `thereupon invited plaintiffs to file proof of loss as required by the policy,' and thereby waived the five-day provision, it was held in National Surety Co. v. Fletcher Sav. & Trust Co. (1930) 201 Ind. 631, 169 N.E. 524, that the averments were sufficient to withstand a demurrer." 23 A.L.R.2d p. 1098.
"However, where the surety acknowledged receipt of notice without any complaint as to its delay, and thereupon conducted a lengthy correspondence with the assured with the apparent purpose of determining the amount of liability, it appearing that at no time did the surety mention the original notice, it was held in Roark v. City Trust, S. D. & Surety Co. (1908) 130 Mo.App. 401, 110 S.W. 1, that the surety waived any complaint on the ground of insufficiency of notice." 23 A.L.R.2d p. 1101.
Our Supreme Court in Wheeler v. London Guarantee & Accident Co., Limited, 180 La. 366, 156 So. 420, said:
"If the insurer receives notice and proofs of the insured's claim after the expiration of the time stipulated in the policy for the giving of such notice and then plants its defense solely upon a ground not relating to the time for giving notice, the insured has reason to believe that the insurer intends to waive its right to defend on the ground that timely notice of the accident was not given. And in case the insured brings an action under the policy and incurs expenses incident to the suit, the insurer cannot be heard to say in its answer for the first time that timely notice was not given. * * *"
In Inter-City Express Lines, Inc. v. Hartford Accident & Indemnity Co., La. App., 178 So. 280, the predecessor of this court stated:
"* * * It is true the policy required the employer to give `immediate written notice * * * to the surety at its Home Office' and that this was not done, but that provision of the policy, like the provision in the accident policy considered in Wheeler v. London Guarantee & Accident Company, supra, could be waived and is waived when the insured is led to believe that a notice given its surety's general agent is all that will be required. Our conclusion on this point, therefore, is that the insurer has waived the policy provision with respect to notice being sent to its home office."
Denial of liability is equivalent to a declaration that the insurer will not pay although proofs are furnished in accordance with the policy. 29A Am.Jur. 1431; Pete v. Metropolitan Life Ins. Co., La.App., 171 So. 868.
The case of J. S. Fraering, Inc. v. Employers Mutual Liability Insurance Co. of Wisconsin, 5 Cir., 242 F.2d 609, cited by defendant, is not apropos for there the insurer had done nothing which could be construed as a waiver of the requirement of giving notice.
Although the particular defense is not pleaded in answer because the facts giving rise to it only came to light during the course of the trial, the insurer now contends that plaintiff was guilty of violating Section 5 of the policies which in part *481 provides that no employee, to the best of the knowledge of the assured, had committed any fraudulent or dishonest act in the service of the assured or otherwise. The argument is advanced that in November 1956 Mr. Cartullo had knowledge of dishonesty on the part of an employee or employees and that when plaintiff renewed the earlier policy effective December 30, 1956, for an increased amount, Cartullo deceived the insurer by not disclosing that theft had taken place, and that such concealment amounted to a violation of Section 5 which was highly prejudicial to the insurer. The portion of Section 5 now sought to be invoked by the insurer would not apply to the employees Matthews, Brown and Jeanlouis, as Mr. Cartullo did not learn until June 1957 of their dishonesty and fraudulent acts. Prior to the issuance of the renewal policy, Mr. Cartullo only "sensed" that something was wrong.
Defendant's counsel also point out that Mr. Cartullo admitted that another employee of plaintiff (one Jefferson), who had worked with Matthews, had been arrested and convicted in 1956 and sentenced to ten years for theft. The argument follows that whereas this fact was withheld from the insurer, it is not liable on account of the illegal acts of said employee. Such argument has no validity whatsoever. Plaintiff did have Jefferson, a negro, in its employ at one time, and he was convicted in 1956 for breaking and entering a residence. But Jefferson terminated his employment with plaintiff in the early part of 1956 before the period during which the systematic thefts took place.
Evidently plaintiff's New Orleans branch is operated on a calendar year basis. Approximately 17,000 separate items of merchandise are handled and dealt in and a perpetual inventory card is kept for each specific item. At the inception of the "Cardex" system, as it is referred to, on each card was entered the amount of stock of the type described on the card which was then on hand, and as additions were made to that stock by purchases, etc., the same were duly entered on the card and all sales or withdrawals are noted and deducted from the total so that each card would show at all times exactly what quantity of each item remained. A physical inventory of the stock is made annually and the count of each item compared with the balance shown on the card in order to determine the correct inventory. The annual inventory was routinely taken in January 1957, and when the thieves were apprehended in June of that year, a special count inventory was taken.
The policies protect plaintiff for that part of any inventory shortage which the assured shall conclusively prove to have been caused by the fraud or dishonesty of any of the employees. It would be impossible in a situation involving systematic theft over a period of months, such as is before the court, for an insured to prove by eyewitnesses what merchandise was carried off by the thieves. The defendant argues that the burden of proof rested on the assured to "conclusively prove" the loss which forms the basis of its demand and contends that the manner in which plaintiff attempts to establish the loss falls far short of being in the nature of conclusive proof. We allowed the assured in Purity-Reiss Candy Co. v. Maryland Casualty Company, La.App., 128 So.2d 677, to recover under a similar policy on a showing there had been shrinkages in profits which could only have resulted from systematic theft on the part of the assured's employees. There, also, the insurer contended that the proof adduced by plaintiff was not such "conclusive proof" as was required by policy provisions. In answer to that contention we said:
"It is true the blanket position bond upon which the suit is based makes the insurer liable for any loss of money or other property, real or personal `which the Insured shall conclusively prove.' Defendant argues plaintiff's method of computing its claim, said to be unreasonable and unrealistic, does not conform to the conditions of the *482 bond which require conclusive proof. The particular provision of the policy relied on should not be rigorously construed. The general rule has been stated to be that `conclusive' evidence in burglary and theft policies should be interpreted so as not to give the term its strict technical meaning, but rather it should be given a reasonable construction, i.e., evidence reasonably establishing a loss. Alexandre of London, Washington, D.C., Corporation v. Indemnity Insurance Company of North America, D.C., 182 F.Supp. 748; Morrow Retail Stores, Inc. v. Hartford Accident & Indemnity Co., D.C., 111 F.Supp. 772; Couch's Cyclopedia of Insurance Law, Vol. 8, § 2241; 169 A.L.R. 228 et seq.; Leader Clothing Co. v. Fidelity & Casualty Co. of N. Y., 10 Cir., 237 F.2d 7."
All that the above means is that the assured to be successful need only to adduce clear and satisfactory evidence which, to the court, is convincing in character.
Were the assured to be denied the right to prove the loss from its books, records and documents, such policies as plaintiff holds would be of little or no benefit as no adequate protection would be afforded. We think the only method available to plaintiff, and incidentally the best method, of proving what was stolen would be by resorting to inventories. The purpose of the Cardex perpetual inventory is to make possible an instant ascertainment at all times of the type and quantity of the stock on hand. If it be a fact that the entries appearing on the cards were correctly made, the perpetual inventory would reflect the true amount of merchandise which should be available and in stock. If the annual physical count showed a lesser amount and there is no other logical explanation for such difference, then it would be reasonable to hold that the thieves systematically made away with the merchandise which cannot be accounted for.
But the assured bears the burden of showing that the inventory losses are not due to negligence, mistake, disobedience to orders, carelessness and bad judgment. Riggs v. American Surety Co., 217 La. 406, 46 So.2d 313; Service Enterprises, Inc. v. National Surety Corp., La.App., 149 So.2d 149. Plaintiff produced evidence to the effect that the 92 inventory cards in evidence set forth the quantity and type of merchandise that should have been on hand respectively in January and June of 1957, and that the physical counts made in said months showed a shrinkage in the inventory for which there was no explanation except theft. Plaintiff transferred the alleged shortages appearing to its Exhibit 3 and translated the missing metal from inches to pounds in accordance with a chart published by American Smelting & Refining Company, which is also in evidence, and computed the monetary loss by multiplying the total poundage @ 65 cents, said price being the proven average cost of the merchandise. Such price should be used as the standard in arriving at the value of the merchandise.
Counsel for defendant argue that if the balances shown on the inventory cards were erroneous, the amount of the loss could not, with any degree of certainty, be ascertained, and we agree that the verity of the inventory cards is the key to the whole situation.
Defendant strenuously attacks the correctness of the 92 cards on the contention that errors, omissions and inexplicable inconsistencies of such a nature as to totally annihilate any probative value in the cards appear thereon. In order to point up errors, omissions and inconsistencies, counsel have presented with their brief an analysis of each of the 92 cards and these analyses, it is said, fully reflect that each and every card is so unreliable as to be useless in the matter of determining what the inventory should have been.
We have endeavored to compare and reconcile plaintiff's exhibits with counsel's analyses and find that to pass upon the 92 *483 caras pro and con would entail a Herculean task beyond our capacities due to our very limited knowledge and experience in the science of accounting. The cards and analyses are long and intricate and we are of the mind that their examination should be left to experts. From our examination, however, it does appear that there are probably some circumstances existing which cast grave suspicion on the correctness of some of plaintiff's exhibits and which call for an explanation if plaintiff is to be successful in the matter of making its claim certain.
For instance, Card 5 shows that on September 26, 1957, the stock amounted to 116 inches, but the next entry of November 15, 1957, at which time a physical count was taken, shows only 53 inches on hand. In other words, for the five months after the adjustment of Item 5 to conform to the June 14, 1957, inventory, the inventory shortage was 63 inches, or more than 50 percent of what plaintiff should have had on hand on November 15, 1957. The same card shows that on December 30, 1958, there was a sale of 12 inches from a zero inventory, and a few days later on January 13, 1959, the last notation shows a physical inventory of 126½ pounds with no explanation as to the origin of that figure.
With reference to Card 23 plaintiff had adjusted the balance to take care of the shortage shown by the stock count made on June 14, 1957, but by November 15, 1957, the count showed a new shortage of 82½ inches or one-third of the supposed stock on hand of 220 inches. Plaintiff's witnesses claimed that there was no theft after June 14, 1957, and if this be true, the inventory shortage thereafter must have arisen from other causes such as human error, posting errors, loss through cutting the metal, etc.; all this, we think, requires explanation.
Other cards could be discussed, but we think any comment thereon would be superfluous; suffice it to say, some circumstances cloud the cards with suspicion.
The trial judge refused to admit inventory cards before 1956 and subsequent to 1957. We think the examination should have covered a wider range, for if it appeared inconsistencies existed earlier than 1956 and later than 1957, when plaintiff claims there were no thefts, it might be that the inconsistencies are of such magnitude as to adversely affect the veracity of the cards for the crucial period.
Also, from our examination of some cards there seem to be overages at times subsequent to 1957 in certain items. For all we know it could possibly be that these overages might constitute what the plaintiff thought has been stolen by the three employees. In order to get a true perspective of the inventory situation, our thought is that cards for the entire years of 1955, 1956, 1957 and 1958 should be considered in any attempt at establishing the correctness of the inventory cards for the eight months in question.
The fact being that a correct solution of the problem presented by the case before us would require a minute examination, thorough consideration, and a skillful comparison of long and intricate accounts, etc., amounting in the aggregate to 184 documents, plus many pages of testimony, the ends of justice would require that the case be remanded to the trial court in order that expert testimony may be adduced in order to establish the bona fides of the claim which the plaintiff is asserting. The trial judge is directed to again set the case down for hearing and to permit the litigants to introduce whatever expert evidence they deem necessary to support their respective causes and whatever other pertinent testimony they think necessary to foster a proper adjudication of plaintiff's claim, such adjudication to be made on the basis of the evidence already in the record and the new or additional evidence the parties choose to adduce. And if the trial judge be of the opinion that he should appoint an expert to examine the accounts and report his findings to the court, such *484 appointment is directed. LSA-C.C.P. art. 192. See In re Taliancich & Perez Co., 221 La. 279, 59 So.2d 189; Southern Plumbing & Supply Corp. v. Egert, La. App., 110 So.2d 762; Breen v. Downey, 34 La.Ann. 1217.
There should be no imposition of statutory penalties against defendant for such is not warranted. The evidence of the loss which plaintiff furnished to the insurer is not free of doubt as to the correctness thereof, and we think that there was reasonable justification for payment being declined.
For the reasons assigned, the judgment appealed from is set aside, and it is ordered that the matter be remanded to the court below for further proceedings not inconsistent with the views hereinabove expressed; costs in the lower court are to await a final determination of the matter; costs of appeal are to be borne by plaintiff.
Set aside and remanded.