222 So.2d 512 (1969)
AMERICAN DRUG STORES, INC.
v.
The HOME INDEMNITY COMPANY.
No. 3420.
Court of Appeal of Louisiana, Fourth Circuit.
May 5, 1969.
*513 Henican, James & Cleveland, Murray F. Cleveland and Carl W. Cleveland, New Orleans, for American Drug Stores, Inc., plaintiff-appellant.
Sessions, Fishman, Rosenson, Snellings & Boisfontaine, Cicero C. Sessions and Curtis R. Boisfontaine, New Orleans, for the Home Indemnity Co., defendant-appellee.
Before REGAN, CHASEZ and BARNETTE, JJ.
CHASEZ, Judge.
The plaintiff, American Drug Stores, Inc., hereinafter referred to as American, brought this suit against the defendant, The Home Indemnity Company, to recover the sum of $25,000.00, an amount which represents the policy limits of a Fidelity Bond issued by defendant in favor of the plaintiff.
The claim is based on an alleged series of thefts of money from American by one of its employees, Miss Eunice Cenac, during the period January 1, 1961 to September 24, 1962. Judgment was rendered in favor of American in the sum of $12,250.00, plus legal interest from the date of judicial demand until paid. American now takes this appeal and asks that the judgment be increased to $25,000.00, the full amount of the fidelity bond. Defendant has answered this appeal and has asked that the judgment be reversed and that the plaintiff's suit be dismissed at its cost.
American operates a retail drugstore in downtown New Orleans; Miss Cenac was hired by American as a cashier in the store in April, 1956. She continued this employment until September 24, 1962, when it was discovered that she was stealing money from the store. The method employed by Miss Cenac in her dishonesty involved a manipulation of the sales books used by American employees in recording their sales. The defendant alleges that Miss Cenac's thefts would have come to light much sooner than they did had American not been lax in effecting a system which it had devised for discovering such thefts. In any event the thefts were not discovered until Miss Cenac had stolen a considerable sum from American. In two words, this appeal is concerned with how much was actually stolen by Miss Cenac during the period January 1, 1961 to September 24, 1962.
Miss Cenac herself admitted at the trial below that she had been systematically stealing from the plaintiff from 1959 to the day she was caught in September 1964. She described in detail the manner in which she accomplished her thefts and made these statements as to the amount of these thefts:
"BY MR. M. CLEVELAND:
"Q. Miss Cenac, immediately, after you had reviewed this matter with Mr. Farnet, did you establish to your own satisfaction the amount you had taken over the period of these years, 1961 and 1962?
"A. Yes.
"Q. What was the average amount per day that you took during those days?"
"MR. BOISFONTAINE:
"I object to that as vague."
"THE COURT:
"Of course, it could go to the weight of the evidence."
"MR. BOISFONTAINE:
"Averages and guesses and approximations are not the type of evidence we would accept."
"THE COURT:
"That is correct. But the Court would have to determine for itself what weight to give to that average situation. The query is the proof of that."
"BY MR. CLEVELAND:
"Q. What were the amounts that you took from the American Drug Stores between 1961 and the latter part of September, when you were discharged, on a daily basis?
"A. On a daily basis it was $75.00 a day.
*514 "Q. An average of about $75.00 a day?
"A. Yes.
"Q. Did you reconstruct this to your own satisfaction immediately after it happened and immediately after you were discharged?
"A. Yes."
"BY MR. BOISFONTAINE:
"May my objection become general?"
"THE COURT:
"Yes."
"BY MR. M. CLEVELAND:
"Q. Did Mr. Farnet interrogate you and ask you questions about how you stole the money and what your methods were?"
"MR. BOISFONTAINE:
"I object. It's irrelevant."
"THE COURT:
"That would be irrelevant."
"BY MR. M. CLEVELAND:
"Q. When you figured this average of about $75.00 a day over this whole period of a year and nine months, what was the largest amount you took on any day?"
"A. $165.00 or $170.00 was the largest I had taken a day.
"Q. And what was the smallest amount that you took?
"A. The smallest would be $25.00 or a little less."

* * * * * *
"Q. Did you figure out the total amount of money that you took from American Drug Stores during 1961 and through September 24, 1962? And if so, what was that amount approximately?"
"MR. BOISFONTAINE:
"I object, if the Court please, unless the witness first tells us how precisely the amounts were arrived at. So far the evidence has only been conjectual and guess. A multiplication of the amount of days by guesswork does not make it stronger"
"THE COURT:
"The query is if she knows the total amount she took. Now how she knows it, I don't know. I think that could be brought out by cross-examination."
"MR. BOISFONTAINE:
"I follow the rule and withdraw the objection.
"BY MR. M. CLEVELAND:
"Q. Would you state the total amount you figured you took in 1961 and through September 24, 1962?
"A. It came up to $34,000.00 I do believe. A little better than $34,000.00"

* * * * * *
"CROSS-EXAMINATION BY MR. BOISFONTAINE:
"Q. Miss Cenac, I asked you a question or two a moment ago in the Proffer. And with reference to your working at American Drug Stores and your alleged stealing from them, you didn't keep any records, did you?
"A. No. Iwhen I went into the store, like I am going to work this morning
"Q. You'd take whatever you could and leave?
"A. Whatever I wantedwhatever the book would say that is what I would have
"Q. Did"
"MR. M. CLEVELAND:
"Would you let her finish her answers?"
"BY MR. BOISFONTAINE:
"Q. Had you finished?
"A. I never did keep a record. But on the times I went to the store that morning when I would keep my own personal records *515 for that day, but after that day, the records were destroyed.
"Q. In other words, it was part of your operation to destroy the records?
"A. Yes.
"Q. So you don't know of your own knowledge with any degree of accuracy, any precise amount you took at one time?
"A. No, but it was more than twenty-five, because they had to have a book containing sometimes fifty to sixty to seventy dollars with the merchandise in it.
"Q. But again, you have no record of that? You are guessing again?
"A. No, I am not guessing. I am guessing at the figure. But if they had $60.00 in that book, that's what I got.
"Q. Although you did ring up some of that money, but you didn't get all of the money in the book, but a convenient amount?
"A. The dollars, not the cents.
"Q. Do you have those books?
"A. No.
"Q. Have you ever seen those books since September of 1962?
"A. No, because I destroyed them when I left the store that night."
The defendant contends that these statements are too vague and speculative to establish with the legal certainty required the amount of the loss suffered by American from Miss Cenac's dishonest activities. Further, it contends that the other methods employed by the plaintiff to establish this loss, i.e. inventory and profit-loss statements, are not only too indefinite to be considered, but they are actually prohibited from use for this purpose by the following exclusionary clause in the indemnity contract:
"EXCLUSION
"Section 2. This Bond does not apply to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of money or other property which the insured can prove, through evidence wholly apart from such computations, is sustained by the insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees."
The trial judge we believe quite correctly answered defendants objections to the use of the inventories and profit-loss statements in this case, when he stated in his Reasons for Judgment:
"The Court is of the opinion that the above quoted Section `2' means that if the insured could not provethrough evidence wholly apart from `such computation' (inventory or profit and loss statements)that it suffered a loss, then the policy is not applicable. Then any such loss which the insured suffered through fraudulent or dishonest acts of an employee would not be covered by the policy. Conversely, if the insured is able to prove, through evidence `wholly apart' from such computation, that a loss did occur, then any such loss is covered. The question of the amount of the loss then becomes a question of proof as to the amount of any such loss, not as to the loss itself.
"The Court finds as a fact that the plaintiff has shown by evidence `wholly apart' from `such computations' (i.e., inventory or profit and loss statements) that the plaintiff did suffer a loss. Such evidence is the uncontradicted testimony of Mrs. Eunice Cenac, the person who committed the theft of the cash. The question then, for the Court's determination, *516 is the amount of such loss by the theft of cash by Mrs. Cenac."
He then proceeded to consider the inventory and profit-loss statements as substantiating evidence together with the testimony of Miss Cenac in his attempt to establish the full amount of the loss to be indemnified by defendant under its contract with the plaintiff.
We find he was in error, however, when he found that all of this evidence fell short of establishing by a preponderance of the evidence that any fixed sum or sums were lost by the plaintiff as the result of the thefts of cash by Miss Cenac.
We find that the trial Court has placed an intolerable burden upon the plaintiff herein. The plaintiff has used the only methods which an employer has at its disposal to prove the amount of its loss by embezzlement of one of its employees. It has produced the testimony of the culprit, who admitted systematic thefts over many months. Naturally the thief did not keep accurate records of her crime, however she did know the approximate range of her thefts each day during this period. She was able to give a valid estimate of the total amount taken during the period of her crime, an amount which greatly exceeded the amount sued for herein. Further, this total was substantially the same as the amounts reflected by the inventory and profit-loss statements produced by the plaintiff. We can conceive of no more accurate method by which an employer could hope to prove his loss and hold that it is sufficient basis for granting judgment for plaintiff in the sum of $25,000.00, the full amount of the fidelity bond.
We admit that the problem would have been much more complex had the amount of the bond been greater than the sum which plaintiff was claiming as a loss herein. Then we would be concerned with establishing to the penny the exact amount of this loss. However, when all reasonable methods of proof establish that the loss clearly exceeded the amount of the bond, we feel no hesitation in awarding judgment for plaintiff in the full amount of the indemnity contract.
Were we to hold, as defendant seems to suggest, that inventory computations and profit-loss analysis are inadmissable, even to corroborate other proofs, we would render worthless fidelity coverage for loss of money in a business similar to the one operated by plaintiff. We cannot conceive of a method of tabulating the amount of the loss without resorting to the use of company records for substantiation. See Standard Brass & Mfg. Co. v. Maryland Casualty Co., 153 So.2d 475, La.App. 4 Cir. 1963.
The plaintiff-appellant has asked for the 12% penalty provided by R.S. 22:658, plus reasonable attorney's fees, based on its claim that the defendant has unreasonably and arbitrarily refused to pay the amount due on the bond despite complete and detailed proofs of loss submitted to it by American. The imposition of statutory penalties is not warranted. The decision to award plaintiff the full amount of the bond in this case was not easily reached, and was certainly a question which could be a subject for honest debate, particularly in view of the fact that the interpretation of the exclusionary clause on the bond was first presented for judicial determination in this case.
Finally, plaintiff has asked as an element of special damages, for the amount expended for special audits conducted to ascertain the loss which it suffered.
We cannot justify the imposition of such charges herein. Contrary to the findings of the trial Court we have been aided by the findings of such audits in reaching our decision herein. However we must reject this claim on another basis. It is evident the plaintiff would have been able through *517 its own daily records to have ascertained the total amount of its loss without the resort to a special audit, had it properly and diligently kept such records. It did not do so however, thus the defendant should not be required to shoulder the expense of a special audit under these circumstances.
For the reasons hereinabove set forth the decision of the trial Court is amended to award judgment to plaintiff, American Drug Stores, Inc. against the defendant, The Home Indemnity Company, the sum of $25,000.00 and as thus amended, the judgment is affirmed; the Home Indemnity Company to pay all costs of this appeal.
Amended, and as amended, affirmed.
REGAN, Judge (concurring).
I respectfully concur in the principal decree; however, I am of the opinion that the majority was totally unjustified in failing to award damages in the amount of $1,500.00 as prayed for as the extra expense incurred in conducting a special audit in order to ascertain the extent of Miss Cenac's wrongdoing.
The record discloses that Derbes and Derbes, accountants, devoted 184 hours at $8.50 per hour from September 29th through March 12th in an endeavor to ascertain by virtue of the special audit the amount of plaintiff's loss; and the author of the majority opinion asserts therein that "* * we have been aided by the findings of such audits in reaching our decision herein. * * *"
I am convinced that there is a direct causal relation between the defendant's defalcations and the plaintiff's need to have a special audit; therefore, I am unable to agree with the majority as a matter of law that, the blame for the theft falls upon the plaintiff so as to preclude its recovery of the accounting fees. The existing jurisprudence and specifically the rationale emanating from Stone v. Ellzey, La.App., 170 So.2d 120 (1964), Writs Refused (1965), fully supports the foregoing conclusion.